**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**

| | |
|---|---|
| **JOSEPH WHEELING,** | **CASE NO. 5:24-CV-129-KKC** |
| **Plaintiff,** | |
| **v.** | **OPINION and ORDER** |
| **CITY OF WINCHESTER,** | |
| **Defendant.** | |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendant City of Winchester's (the "City") Motion for Summary Judgment. (R. 19.) Now that this matter is fully briefed, it is ready for review. For the following reasons, the Defendant's Motion is GRANTED.

## I.   FACTUAL BACKGROUND

Plaintiff Joseph Wheeling is a firefighter. Wheeling is currently employed at the Clark County Fire Department, which is also where he began his career as a firefighter in 2008. (R. 24 at 27, 1.) From 2015 to 2023, Wheeling worked as a firefighter for the City of Winchester. (R. 24 at 1.) During that time, Wheeling rose through the ranks and was ultimately promoted to Fire Marshal. (*Id.*) On May 16, 2023, the City terminated Wheeling for "inefficiency or violation of the rules adopted by the Board of Commissioners." (*Id.* at 5.)

Wheeling's termination relates to a March 31, 2023, mental health episode where he attempted suicide while on duty by ingesting about 9 or 11 Adderall pills. (R. 19-1 at 7; R. 27 at 2.) Wheeling's mental health struggles stem from a series of trauma and abuse dating back to his childhood years. (R. 19-1 at 2.) Wheeling has been diagnosed with multiple mental health conditions: generalized anxiety disorder, major depressive disorder, and post-traumatic stress disorder ("PTSD"). (*Id.*) Although Wheeling has dealt with the symptoms of

his mental health conditions for most of his life, he managed to maintain a positive performance record as a firefighter. (*Id.* at 1–2.) The parties dispute whether Wheeling's suicidal ideation interfered with his ability to perform his job. (*compare* R. 19-1 at 21, *with* R. 24 at 4.) The March 31, 2023 episode was predated by a year-long struggle with mental health issues.

In 2022, Wheeling's mental health plummeted. (R. 24 at 2.) The first reported incident happened on March 25, 2022, when Wheeling was at a high school event speaking to students. (R. 19-1 at 6.) During the event, Wheeling started having intrusive thoughts so bad that he had to leave. (*Id.*) From that point on, his mental health struggles continued to grow. (R. 24 at 2.)

Between June 22, and July 25, 2022, Wheeling sought in-patient treatment at the International Association of Fire Fighters Center for Excellence. (*Id.*) Wheeling utilized FMLA leave for his time off from June through August, which was formally approved by the City of Winchester. (*Id.*, R. 19-6.)

On August 8, 2022, Wheeling returned to work. (R. 19-1 at 6.) After leaving the Center for Excellence, Wheeling began receiving psychiatric care at Bluegrass Behavioral Health and Consulting Services. (R. 24 at 2.) Wheeling's treatment plan included medication management and therapy. (*Id.*) Even though Wheeling was actively seeking treatment, his mental health continued to burden him.

On October 10, 2022, Wheeling submitted a letter to Fire Chief Christopher Whiteley notifying him that he needed additional time off to address his mental health issues. (*Id.*) Wheeling took a second stint of FMLA leave from October 10, 2022, until December 2, 2022, when his FMLA leave was exhausted. (*Id.* at 2–3.) On December 1, 2022, Wheeling's medical provider prepared a letter stating that Wheeling remained unable to return to work and

needed additional time to undergo further treatment. (*Id.* at 3.) During this time, Wheeling's provider started a new treatment with him that was aimed at improving his treatment-resistant depression. (*Id.*)

On January 19, 2023, Wheeling's provider prepared a letter certifying that Wheeling was approved to return to work on January 23, 2023. (*Id.*) The City, however, would not clear Wheeling to return to work at that time because his treatment plan included the use of medical marijuana. (*Id.*) Although the medical marijuana helped provide relief from his symptoms, Wheeling agreed to discontinue it immediately so that he could return to work. (*Id.*)

Wheeling ultimately returned to work on March 14, 2023. (*Id.*) Shortly after his return, Wheeling was prescribed Adderall. (*Id.*) On March 31, 2023, Wheeling attempted suicide while at work by taking multiple Adderall pills within a short period of time. (*Id.*) Notably, his attempted suicide took place one or two days after he began taking Adderall. (R. 19-1 at 7.) Wheeling informed his boss, Major Jacob Allen of his attempted suicide, prompting Major Allen to confiscate the pills and notify Wheeling's wife. (*Id.*) His wife contacted poison control and took him to the hospital, where he was placed on suicide watch and released six hours later. (*Id.*)

On April 4, 2023, without knowledge of his recent suicide attempt, the City's Board of Commissioners promoted Wheeling. (*Id.* at 8.) It was not until April 10, 2023, that the City was notified of the incident. (*Id.*) On that date, Chief Whiteley sent a memorandum to City Manager Micheal Flynn detailing the March 31, 2023 incident and requesting that Wheeling be placed on paid administrative leave effective immediately. (*Id.* at 7.) Chief Whiteley's memo stated that "[i]t is obvious to me that Major Wheeling is mentally unfit at this time to serve in any role within the Winchester Fire Department. I recommend this action step out

3

of an abundance of safety for not only Major Wheeling but also for the men and women with whom he serves alongside." (*Id.*) Wheeling was placed on administrative leave that day. (*Id.*)

On May 1, 2023, Wheeling was presented with a letter stating that he was formally charged with inefficiency or violation of the rules adopted by the Board of Commissioners. (R. 24 at 4.) Allegedly, when Flynn presented the letter to Wheeling, he told Wheeling that this was the "second occurrence," and indicated that the first occurrence was Wheeling's attendance at the Center for Excellence. (*Id.* at 4–5.) On May 16, 2023, the Board of Commissioners voted to terminate Wheeling's employment based on these charges. (*Id.* at 5.)

On May 5, 2024, Wheeling filed his Complaint alleging retaliation under the Family and Medical Leave Act ("FMLA"), disability discrimination under the Kentucky Civil Rights Act ("KCRA"), failure to accommodate under the KCRA, and workers' compensation retaliation under KRS § 342.197. (R. 1.) Once the discovery deadline closed, the City filed the pending motion for summary judgment. (R. 19.)

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden and must identify "those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and quotation marks omitted). All evidence, facts, and inferences must be viewed in favor of the nonmoving party. *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "In order to defeat a summary judgment motion, . . . [t]he nonmoving party must provide more than a scintilla of evidence," or, in other words, "sufficient evidence to permit a reasonable jury to find in that

4

party's favor." *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

### III.  ANALYSIS

The City moves for summary judgment on all claims. (R. 19 at 1.) In his response, Wheeling waived his FMLA and KRS 342.197 worker's compensation claims. (R. 24 at 5.) Thus, the sole remaining claims are for disability discrimination and failure to accommodate under the KCRA. (*Id.*)

### A.  Supplemental Jurisdiction

Before discussing the merits of the City's motion, the Court must first address a threshold issue. This Court has jurisdiction to hear Wheeling's FMLA claims under 28 U.S.C. § 1331 and the state law claims pursuant to 28 U.S.C. § 1367. However, Wheeling waived his FMLA claim, making the sole remaining claims Kentucky state law claims. (R. 24 at 5.) Both parties assert that the Court should maintain supplemental jurisdiction over the state law claims. (*Id.*; R. 27 at 3 n.1.)

The Sixth Circuit's decision in *Providence* provides guidance for a district court in this scenario:

> It is apparent that trial courts do possess some discretion to decide a pendent state law claim once the federal basis for jurisdiction is dismissed. A trial court must balance the interests in avoiding needless state law decisions discussed in *United Mine Workers* against the "common sense" policies of judicial economy discussed in *Rosado*, when deciding whether to resolve a pendent state claim on the merits.

934 F.2d 1402, 1412 (6th Cir. 1991).

Here, the underlying facts of Wheeling's FMLA and state law claims are intertwined, providing substantial similarity between the predicate facts of the federal and state law claims. Further, discovery has closed and a substantial amount of time and resources have been expended in this case. Because the interests in judicial economy outweigh the benefit of

5

having a Kentucky state court decide the remaining claims, the Court will exercise its supplemental jurisdiction.

### B. Remaining State Law Claims

Wheeling asserts two separate claims under the KRCA. He alleges that the City discriminated against him because of his disability and that the City failed to reasonably accommodate his disability . (R. 1 at 4–5.) The City argues that there is no evidence that it discriminated against Wheeling because of his disability, denied him a reasonable accommodation, or that any such accommodation would have enabled him to perform his job or any other job at the fire department. (R. 19-1 at 1.) The Court will address each argument in turn.

Wheeling's disability-discrimination and failure to accommodate claims are brought under the KCRA. Because the KCRA mirrors the language of the ADA, courts interpret the KCRA "in consonance with federal anti-discrimination law." *Bank One, Ky., N.A. v. Murphy,* 52 S.W.3d 540, 544 (Ky. 2001). "Given similar language and the stated purpose of KRS Chapter 344 to embody the federal civil rights statutes, including the Americans with Disabilities Act" this Court may look to federal case law in interpreting the Kentucky Civil Rights Act with respect to Wheeling's claim of disability discrimination under KRS 344.040. *Hallahan v. Courier-Journal,* 138 S.W.3d 699, 705 (Ky. Ct. App. 2004).

### i. Disability discrimination claim

It is unlawful for an employer "[t]o fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, . . . because the person is a qualified individual with a disability." KRS 344.040(1)(a). Establishing a claim for discrimination can be proved by direct or circumstantial evidence. *Williams v. Wal-Mart Stores, Inc.,* 184 S.W.3d 492, 495–96 (Ky. 2005). Wheeling brings the claims based on circumstantial evidence. (R. 24 at 18.)

6

Therefore, he must satisfy the *McDonnell Douglas* burden shifting test. *Williams*, 84 S.W.3d at 496 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under the McDonnell Douglas framework, Wheeling must first prove a *prima facie* case of discrimination. *Id.* at 802. The burden then shifts to the City to articulate a legitimate, nondiscriminatory rationale for the discharge. *Id.* at 802–804. If the City articulates a legitimate reason, the burden shifts back to Wheeling to show that the reason is in reality a pretext to mask discrimination. *Id.* at 804–806. The City argues that Wheeling's disability discrimination claim fails because he was discharged for a legitimate, nondiscriminatory reason. (R. 19-1 at 18.)

### a. Wheeling  established a *prima facie* case of disability discrimination

To establish a *prima facie* case of disability discrimination, Wheeling must show: (1) that he had a disability within the meaning of KRS 344.010(4); (2) that, despite the disability, he was otherwise qualified to perform the essential functions of the job in question, either with or without reasonable accommodation; (3) that he suffered an adverse employment action because of his disability; and (4) that he was replaced by a non-disabled person or that similarly situated non-disabled employees were treated more favorably. *Larison v. Home of the Innocents*, 551 S.W.3d 36, 41 (Ky. Ct. App. 2018).

Here, the City does not contest Wheeling's claim that he has a disability. (R. 19-1 at 17.) Consequently, the Court will assume that Wheeling could satisfy the first element of his *prima facie* case.  There is also no dispute that Wheeling suffered an adverse employment action: he was terminated on May 16, 2023. (R. 24 at 5.) As to the fourth element, Wheeling declares that he was replaced by a non-disabled person. (*Id.* at 19.)

The City's primary argument relates to the second element. The City asserts that Wheeling's mental health struggles rendered him unqualified to perform the essential functions of his job. (R. 19-1 at 17.)

To prove that he is "otherwise qualified" to be a Fire Marshal, Wheeling bears the burden of demonstrating that he can perform the "essential functions" of the job, with or without reasonable accommodation. *See Hawkins v. Bd. of Educ. of Scott Cty.*, 716 S.W.3d 1, 7 (Ky. Ct. App. 2025). The term "essential functions" refers to the fundamental job duties of the position in question, not marginal or incidental tasks. *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014). "A job function may be considered essential because: (1) the position exists to perform that function; (2) there are a limited number of employees available among whom the performance of that job function can be distributed; or (3) the function is highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Hawkins v. Bd. of Educ. of Scott Cty.*, 716 S.W.3d 1, 7 (Ky. Ct. App. 2025) (quoting *Keith v. County of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013).

In assessing whether a job function is essential, courts may consider several factors, including the employer's judgment, the consequences of not requiring the employee to perform the function, the current and past work experience of employees in similar jobs, and the amount of time spent performing the function. *Id.* (quoting *Wyatt v. Nissan North America, Inc.*, 999 F.3d 400, 418 (6th Cir. 2021); *Keith*, 703 F.3d at 925-26. The plaintiff's burden is "not onerous" and requires less than a typical preponderance of the evidence showing. *Jones v. Potter,* 488 F.3d 397, 404 (6th Cir. 2007)

Although determining whether a job function is essential is generally a fact question, summary judgment is appropriate where the record contains no genuine dispute on the

8

issue. *Wyatt v. Nissan North America, Inc.*, 999 F.3d 400, 418 (6th Cir. 2021). To this end, the relevant time in determining whether a plaintiff is a "qualified individual" is at the time of the discharge. *Aston v. Tapco Int'l Corp.*, 631 Fed. Appx. 292, 297 (6th Cir. 2015) (citing *Griffith v. Wal-Mart Stores*, 135 F.3d 376, 380 (6th Cir. 1998)).

The City's written Position Description of "Fire Marshal" detail the job duties. (R. 19-13.) The position characteristics state the following:

> Requires thorough knowledge and experience in fire hazard inspections. Under general supervision of the Fire Chief plans, organizes, coordinates, directs, and participates in the fire prevention program, public education program and fire code enforcement activities of the Fire Department. The position requires a high degree of public contact. Participates in fire suppression and fire prevention activities of the department. Reports to the Fire Chief.

(*Id.* at 1.) Fire Marshals also perform "inspections of properties for fire hazards and fire code violations" and give "fire safety presentations to civic organizations, businesses, industries, churches and schools." (*Id.*) The Position Description explicitly states that the Fire Marshal "must be and remain in excellent physical, mental, and emotional condition" because the job "is often performed in emergency and stressful situations. Additionally, the Fire Marshal, being a fire fighter, has the general duty to respond to emergencies. (*Id.*)

The specific duties of Wheeling's job were to inspect properties for fire hazards and fire code violations and give fire safety presentations to civic organizations, businesses, industries, churches, and schools. (*Id.*) The City lists a myriad of Wheeling's mental health issues, sexual abuse, and drug and alcohol use to argue that he was not qualified to perform the essential functions of the job. (*Id.* at 18–19.) The City's reasoning provides a post-hoc justification for termination largely based on facts discovered after his termination. The relevant focus for the *prima facie* stage is what the employer knew at the time of termination. *Aston*, 631 Fed. Appx. At 297.

Wheeling has provided sufficient facts to which a reasonable trier of fact could conclude he could perform the essential functions of the job. The record reflects that Wheeling's performance reviews throughout his employment with the City were very positive. (*Id.* at 21.) In fact, Wheeling was promoted on April 4, 2023, just days after the March 31, 2023 incident. (*Id.* at 22.) A promotion serves as a strong indication that Wheeling could perform the fundamental duties of his job. Because Wheeling can prove a *prima facie* case of disability discrimination, the Court must proceed to the next step.

### b. The City had a legitimate, nondiscriminatory reason for terminating Wheeling

Once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate a "legitimate nondiscriminatory reason" for the termination decision. *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 497 (Ky. 2005) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,*530 U.S. 133, 142, 120 (2000).

The City purportedly fired Wheeling for "inefficiency, violating City policies, and for being unfit to be a Fire Marshal." (R. 19-1 at 20.) Pursuant to the City's Drug and Alcohol-Free Workplace Policy, prohibited drug use includes "misuse of legally prescribed drugs." (R. 27 at 17.) The record reflects that Wheeling misused his prescribed Adderall medication when he ingested a large portion of pills in an attempt to commit suicide on March 31, 2023. (R. 24 at 4.) This action violates the City policy. (*See* R. 19-11 at 41.) Having found a legitimate nondiscriminatory reason for Wheeling's termination, the Court will proceed to the next step.

### c. Wheeling failed to establish pretext

The burden then shifts back to the plaintiff to demonstrate that the employer's stated reason for the termination was merely a pretext, masking the discriminatory motive. *Williams*, 184 S.W.3d at 497. Pretext may be shown in three ways: (1) the proffered reason has no basis in fact, (2) the proffered reason did not actually motivate the employer's action,

10

or (3) the proffered reason was insufficient to motivate the employer's action. *Hrdlicka v. GM, LLC*, 59 F.4th 791, 805 (6th Cir. 2023). At the summary judgment stage in an action alleging discrimination, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation for its actions. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). "[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

Wheeling first argues that the City relies on after-acquired evidence developed during litigation to justify his termination, rather than information known at the time. (R. 24 at 28.) He further contends that the City lacked knowledge of his broader mental health history, including childhood trauma, intrusive thoughts, alcohol use, and overall mental status. (*Id.*) This argument, however, does not meaningfully undermine the City's proffered reason for terminating him. Although the City references evidence discovered after Wheeling was fired, its stated basis for discharge was clear at the time. He was fired for "Violation of the City Policy – Standards of Performance Conduct" arising from the March 31, 2023 incident. (R. 19-1 at 8.) That reason was communicated to him on May 1, 2023, which was more than two weeks before he was terminated on May 16, 2023. (*Id.*) Because the City's decision was grounded in conduct known at the time, Wheeling's focus on later-developed evidence does not show that the stated reason lacked a factual basis or was not the true motivation for his termination.

Wheeling next contends that a genuine dispute exists as to whether the March 31, 2023 incident was sufficiently serious to justify termination. (R. 24 at 32.) He characterizes

11

the event as an isolated incident tied to side effects from taking new medication and argues that a reasonable jury could find the City overreacted and should have accommodated him instead. (*Id.*) The record does not support this characterization. The March 31 incident did not occur in isolation; rather, it followed an earlier March 2022 episode that Wheeling acknowledges affected his job performance and marked the beginning of a prolonged period of mental health deterioration. (*Id*. at 2, 29.)

More importantly, Wheeling's argument fails to show that the City's proffered reason was insufficient to warrant termination. It is undisputed that the City's policies prohibit misuse of prescribed medications and authorize termination for such violations. (R. 27 at 17.) It is likewise undisputed that Wheeling exceeded his prescribed dosage of Adderall on March 31, 2023. Given these facts, the City's reliance on a legitimate policy violation provides a sufficient basis for termination. Wheeling's assertion that the City could have imposed lesser discipline or provided accommodation does not establish pretext. Nor does the fact that Wheeling's violative conduct may have been linked to a disability negate the legitimacy of the employer's reliance on that conduct. *See Yarberry v. Gregg Appliances, Inc.*, 625 Fed. Appx. 729, 739 (6th Cir. 2015).

Wheeling's arguments, at best, insufficiently provide "a weak issue of fact as to whether the employer's reason was untrue." *Reeves*, 530 U.S. at 148. The evidence provided is insufficient to cast reasonable doubt on the City's proffered reason for terminating Wheeling. Because the record conclusively reveals a nondiscriminatory reason for the termination, the City is entitled to summary judgment on the disability discrimination claim.

### ii. Failure to accommodate

Wheeling also brings a failure to accommodate claim under the KRCA. (R. 24 at 5.) Failing to make a reasonable accommodation falls within the KRCA's definition of "discrimination." KRS § 344.040(1)(c). Wheeling states that he "brings these claims based on

12

circumstantial evidence." (*Id.* at 18.) However, a review of the caselaw reveals that claims premised upon an employer's failure to offer reasonable accommodation necessarily involve direct evidence of discrimination. *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 869 (6th Cir. 2007). When a plaintiff premises his claim upon direct evidence, courts depart from the familiar *McDonnell Douglas* burden-shifting framework applicable in circumstantial evidence cases and instead apply a direct-evidence test. *Id.*

To establish a *prima facie* case of the City's failure to accommodate, Wheeling must show: (1) that he had a disability within the meaning of KRS 344.010(4); (2) that, despite the disability, he was otherwise qualified to perform the essential functions of the job in question, either with or without reasonable accommodation; (3) that the City knew or had reason to know about his disability; (4) that he requested an accommodation; and (5) that the City failed to provide the necessary accommodation. *Larison v. Home of the Innocents*, 551 S.W.3d 36, 45 (Ky. Ct. App. 2018). If a plaintiff establishes the first two elements of a disability discrimination claim, the burden shifts to the employer, to prove "that a challenged job criterion is essential . . . or that a proposed accommodation will impose an undue hardship upon the employer." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016) (internal citations omitted). The City appears to contest only the second and fifth elements. (R. 27 at 5–18.)

### a. Wheeling was otherwise qualified to perform the essential job functions of Fire Marshal

The Second element of this claim is identical to that of the disability discrimination claim. *See Larison,* 551 S.W.3d at 41. The Court has thoroughly analyzed the evidence in determining that Wheeling was otherwise qualified to perform the essential functions of his job at the time he was terminated. *See supra* § III.B.i.a. Because an unreasonable accommodation request proves fatal to a failure to accommodate claim, the focus now turns

13

to the reasonableness of Wheeling's requests. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014).

### b. Wheeling's proposed accommodations were not reasonable

Wheeling also bears the burden of showing "that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002). If the accommodation seems reasonable, the City must show "special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances," *id.* at 402, or that the proposed accommodation eliminates an essential job requirement, *Kleiber*, 485 F.3d at 869. The reasonableness of a proposed accommodation is a question of fact. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998).

Wheeling identifies two potential accommodations that could have aided him in his employment: using medical marijuana and additional personnel to assist him in the office. (R. 24 at 23–24.) The Court will address each accommodation in turn.

### 1. Medical Marijuana

On January 12, 2023, Wheeling presented the City a written certification regarding medical marijuana. (R. 19-1 at 23.) At that time, his treatment protocol included the usage of medical marijuana. (*Id.*) On February 21, 2023, The City Attorney William Dykeman responded by letter prohibiting him from returning to work if he continued using medical marijuana, because it would violate city policies. (R. 19-17.)

> The City's drug and alcohol policy provides the following:
>
> a. Illegally Used Controlled Substances or Drugs Under the Drug-Free Workplace Act of 1988: any drug or any substance identified in Schedule I through V of Section 202 of the Controlled Substance Act (21 U.S.C. 812), as further defined by 21 CFR 1300.11 through 1300.15, as defined by 803 KAR 25:280 is prohibited at all times in the workplace unless a legal prescription has been written for the substance. This includes, but is not limited to: marijuana, amphetamines … as well as any drug not approved for medical use

14

by the U.S. Drug Enforcement Administration or the U.S. Food and Drug Administration. Illegal use includes use of any illegal drug, misuse of legally prescribed drugs, and use of illegally obtained prescription drugs, such as oxycodone, oxymorphone, hydrocodone, and hydromorphone.

(R. 27 at 13; R. 19-11.)

The City's letter explained that, "[Wheeling's] position of employment with the City is a heightened safety awareness level position (HSAL) that involves exceptional duties to the community citizens in the area of public safety." (*Id.*) Because of the heightened safety level required of his position, the City explicitly prohibited his use of medical marijuana. (*Id.*)

Further, the City requested Wheeling to obtain a written statement from a qualified and licensed health care provider that he is able to return to work without marijuana use, and with disclosure of any legal substance which carries a warning label indicating that mental functioning, motor skills, or judgment may be adversely affected. (*Id.*)

Wheeling discussed the City's letter with his healthcare provider, and acknowledged the need to request an accommodation other than medical marijuana use. (R. 19-2 at 147–48.) Wheeling's healthcare provider responded with a March 1, 2023, letter:

> This letter is to certify that Joseph Wheeling has been released to return to work effective immediately with the following accommodation(s):
>
> • Scheduling flexibility to allow him to continue his medical treatment which includes weekly Spravato treatment and therapy.
>
> Please note that additional accommodations may be required in the future and are dependent on progress/status.
>
> Please note that it is felt that the above mentioned is capable of safely performing the required functions of his job while taking his current prescribed medications: Spravato (administered in office, once weekly, and Clonazepam 0.5mg twice daily as needed.

(R. 19-14.) After receipt of the letter, the City confirmed that the proposed treatment plan complied with its policies. (R. 19-15.)

Thus, the City's denial was not based on a blanket prohibition of controlled substances, but on the heightened safety-sensitive nature of Wheeling's position and the lack

15

of assurances that Wheeling could perform the job while using medical marijuana. Wheeling's March 1, 2023 Letter did not present the required documentation or any other supporting evidence requested by the City. Instead, he seemingly conceded that requested accommodation of medical marijuana use was not reasonable by requesting an alternative accommodation – "scheduling flexibility" – which the City approved. Given this evidence, Wheeling has failed to provide sufficient evidence from which a jury could conclude that his request to use medical marijuana was objectively reasonable.

### 2. Additional personnel to assist with job duties

Wheeling also requested "additional personnel to assist him in office." (R. 19-1 at 22.) The City characterizes this as an "unreasonable request that someone else do his job for him." (*Id.*) The only evidence of this request comes from Wheeling's answer to the City's request for admission and his deposition. Although Wheeling cannot remember the specific dates that he requested assistance, he said that he asked "several times." (R. 24-6 at 80.) As to the specific type of assistance Wheeling sought, his deposition reveals the following information:

> **Q. Okay. And what do you think -- during that 25 time period, what do you think the city should have done during that time period?**
>
> A. Look into more accommodations or even send -- or I could have went back to the Center of Excellence for that time period.
>
> **Q. Okay. When you say "look into more accommodations," what do you mean by that?**
>
> A. I've asked several times to have help in the office.
>
> **Q. Okay. What do you -- what kind of help? What do you mean?**
>
> A. Just somebody to help with the -- the workload
>
> **Q. Okay. Like, somebody that they would hire to come help you with your job?**
>
> A. No, they could have had somebody that's already employed there and assisted even while they were on -- you know, on shift to help.
>
> **Q. Okay. What kinds of things would you have needed help with?**

16

A. Fire inspections fire prevention. I -- I've asked to have shifts go and help with fire inspection and I was denied.

**Q. Okay. What -- and when you say you were denied, what was the reason given for that?**

A. Honestly, the shifts didn't want to do it.

(R 24-6 at 78–79.) Wheeling's own statements reveal that the accommodation requested directly relates to "fire inspections" and "prevention." (*Id.*)

The record reflects that the fundamental duties of Fire Marshal include conducting fire safety inspections, responding to fires, and interacting with the public. *See supra* § III.B.i.a. In fact, two of the first three examples of work in the position description lists "field inspections" and "fire prevention." (R. 19-13 at 1.) Based on the evidence presented, the Fire Marshal position exists for the specific purpose of conducting fire inspections and doing fire prevention work.

"In failure-to-accommodate claims where the employee requests an 'accommodation that exempts [him] from an essential function,' 'the essential functions and reasonable accommodation analyses ... run together.'" *Ford Motor Co.*, 782 F.3d at 763. The term "essential functions" refers to the fundamental job duties of the position in question, not marginal or incidental tasks. *Rorrer*, 743 F.3d at 1039. "A job function may be considered essential because: (1) the position exists to perform that function; (2) there are a limited number of employees available among whom the performance of that job function can be distributed; or (3) the function is highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Hawkins v. Bd. of Educ. of Scott Cty.*, 716 S.W.3d 1, 7 (Ky. Ct. App. 2025) (quoting *Keith v. County of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013). An employer is not required eliminate or reallocate an essential job function. *Cooper v. Dolgencorp, LLC,* 93 F.4th 360, 372 (6th Cir. 2024) (citing *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998)). A suggested

17

accommodation is not reasonable if it requires eliminating an "essential" function of the job. *Rorrer*, 743 F.3d at 1039.

Here, the written job requirements, the undisputed testimony from Wheeling and his supervisors, and the duties inherent in being a first responder indicate that field inspections and fire prevention is essential to performing the Fire Marshal role. The City was not required to reassign Wheeling's fire inspection and prevention responsibilities to other employees. *Noel*, 53 S.W.3d at 104. Therefore, based on the record, Wheeling's request to have other employees help with "fire inspections" and "fire prevention" seeks an accommodation relating to the most fundamental aspects of the job. On this evidence, no reasonable jury could conclude that Wheeling's accommodation request would not eliminate or reallocate the most essential functions of his job. *Cooper,* 93 F.4th at 372. Because Wheeling failed to provide a reasonable accommodation request, his failure to accommodate claim fails as a matter of law.

### IV.  CONCLUSION

For the aforementioned reasons, the Court hereby ORDERS the following:

1) that the Defendant's Motion for Summary Judgment (R. 19) is GRANTED.

3) The June 22, 2026, trial of this matter is CANCELED.

4) This case is STRICKEN from the Court's active docket.

5) Judgment will be entered consistent with this opinion.

This 5th day of May, 2026.



**Signed By:**

*Karen K. Caldwell*

**United States District Judge**

18